UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

EUGENE RICHARDSON,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No.  19-cv-01489-RMI

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 24

Plaintiff, Eugene Richardson, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act.  Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 11 & 13), and both parties have moved for summary judgment (dkts. 18 & 24). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of

factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On January 20, 2015, Plaintiff filed an application for supplemental security income, alleging an onset date of December 9, 2014. *See* Administrative Record "*AR*" at 17.[1] The ALJ denied the application on February 14, 2018. *Id*. at 27. The Appeals Council denied Plaintiff's request for review on January 15, 2019. *Id*. at 1-3.

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff – who is now 24 years old – has already had a difficult life by any standard of measure. He was diagnosed with a learning disability in his early school years and was always on an individualized education plan; and, due to a number of early interactions with the juvenile justice system, in lieu of high school, Plaintiff graduated from Camp Sweeny Juvenile Hall with a GED. *Id*. at 526, 662. Shortly thereafter, when he was 19 years old, Plaintiff was involved in a major automobile accident and suffered traumatic brain injuries that caused him to spend the following a 10-day period in a coma while his best friend, who was also an occupant of that vehicle, succumbed to his injuries and lost his life. *Id*. at 525. In addition to the severe brain trauma, the accident also caused Plaintiff to suffer numerous facial fractures, the tearing away (or avulsion) of his right ear, as well as the dislocation of his left shoulder. *Id*. at 676. As if all of this

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-20).

United States District Court
Northern District of California

was not enough of a burden for such a young person to bear, Plaintiff has also been diagnosed with a viral immunodeficiency infection. *See id*. at 19.

### *Medical Evidence From Treating Physicians*

Shortly after the automobile accident, radiologists performed a CT scan of Plaintiff's head at the Santa Clara Valley Medical Center, the results of which showed a number of fractures to the orbital bones surrounding his eyes, as well as the following intracranial hemorrhages: a small left basal ganglion hemorrhagic contusion / axonal injury, a tiny punctuate hemorrhage of the right temporal lobe, and bi-frontal contusions. *Id*. at 662. Following his discharge from the hospital, Plaintiff's treating physician, Peter Gerritz, M.D., noted in February of 2015, that Plaintiff's pain was still so intense that it interfered with his ability to concentrate, to accomplish any of the activities of daily living, as well as with his ability to sleep. *Id*.

Two months later, in April of 2015, his treating speech language pathologist, Kyle Renke, M.S., noted that Plaintiff's cognitive difficulties were consistent with what one would expect from a traumatic brain injury. *Id*. Therapist Renke's evaluation of Plaintiff's language abilities, and the administration of the Woodcock-Johnson Revised Test of Cognitive Ability (WJ-R COG), resulted in the conclusion that Plaintiff "is presenting with deficits in the areas of memory, visual matching, visual closure, vocabulary, and analysis-synthesis." *Id*. When Plaintiff first came home from the hospital, he was unable to remember how to use the remote control for the television; he experienced difficulties with basic household activities, such as matching clothing items; and, he would often get overwhelmed to the point where he would have to retreat to his room to seek the relative quietude of being alone. *Id*.

In late May of 2015, nearly six months after the accident, Dr. Gerritz noted that Plaintiff continued to be mired in confusion; that he still did not recall the accident; that he was unable to properly recall events from even the previous day; that his failing memory, in conjunction with his awareness of the death of his friend, was causing irritability, anger, and increased symptoms of depression; that the extent of his continued memory impairment required him to be supervised around the clock; and, that as a result of these difficulties, Plaintiff continued to be unready for vocational rehabilitation. *Id*. During this same period, Plaintiff's mother reported to another of his

United States District Court
Northern District of California

1    treating physicians, Chris Shin, M.D., that while Plaintiff denied experiencing difficulties with

2    comprehension, nevertheless "he has troubles expressing higher level wants (such as going to a

3    work-place and asking for a job application or scheduling a doctor visit)." *Id*. at 661. Shortly

4    thereafter, given that Plaintiff was diagnosed with "[t]raumatic brain injury with cognitive

5    impairment," he was referred by his treating physicians for "neuropsychologic[al] testing as this

6    would help delineate [his] cognitive deficits and [establish the] necessary accommodations for

7    work/school." *Id*. at 675-78. For this purpose, Drs. O'Connor and Shin referred Plaintiff to their

8    colleague, Richard Wanlass, Ph.D., a clinical professor in the department of physical medicine and

9    rehabilitation, and chief psychologist, at the U.C. Davis Medical Center. *See id*. at 661-664.

10          At the outset, Dr. Wanlass noted that "this evaluation was being performed for clinical (as

11   opposed to forensic or medical-legal) reasons and [] that its purpose was to assist medical doctors

12   with understanding Mr. Richardson's cognitive strengths and weaknesses, emotional state, and

13   treatment needs." *Id*. at 661. Initially, Dr. Wanlass administered three diagnostic instruments

14   geared to evaluating Plaintiff's effort and cooperation, such as to determine the validity of the

15   results garnered from the other 26 diagnostic testing instruments to be administered – in this

16   regard, it was noted that Plaintiff "passed most measures designed to detect insufficient effort . . .

17   [and] [h]is one below-passing score appears to be due to genuine difficulty with attention and

18   concentration." *Id*. at 664. Accordingly, Dr. Wanlass noted that the entirety of the testing results to

19   be discussed below "appear to be a reasonably valid reflection of his current cognitive functioning

20   [as Plaintiff] appeared generally cooperative and invested in doing a good job during testing." *Id*.

21   In what has to be one of the – if not the – most thorough psychological evaluations that the court

22   has encountered in the Social Security context, Dr. Wanlass administered a large number of testing

23   instruments geared towards evaluating Plaintiff's abilities and limitations in a broad array of

24   functional categories including: intellectual and problem solving abilities; adaptive behavioral

25   assessments; processing speed; mental control; evidence of adult attention deficit hyperactivity

26   disorder ("ADHD"); childhood ADHD rating scales; learning and memory; communication;

27   motor functions; visual-spatial functions; and, mental status and psychological adjustment. *Id*. at

28   664-71.

United States District Court
Northern District of California

As to intellectual and problem solving ability, Dr. Wanlass administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), the Wide Ranging Achievement Test – Fourth Edition ("WRAT-4"), and the Neuropsychological Assessment Battery ("NAB"). *Id.* at 664. In this regard, Dr. Wanlass measured Plaintiff's full scale IQ at 74 (placing him in the bottom four percent of all individuals his age) and opined that "[c]onsistent with reported difficulties, Mr. Richardson's intellectual and problem-solving ability mostly tested in the mild-deficit range." *Id.* Regarding his adaptive behavioral skills, Dr. Wanlass administered the Adaptive Behavioral Assessment System – Third Edition ("ABAS-3"), on which Plaintiff's abilities were in the bottom two percent as to health and safety, and self-direction; the bottom five percent as to self-care and functional academics; and the bottom four percent as to practical adaptive skills – rendering a general adaptive composite score in the bottom six percent of all people. *Id.* at 665. In the domain of processing speed, Dr. Wanlass administered five diagnostic instruments (in addition to the portions of the WAIS-IV that measure visual-motor speed) and ultimately concluded that "[c]onsistent with self-reported reduced thinking speed, Mr. Richardson tested mostly in the impaired range on thinking speed tasks . . . [and] that he will generally require additional time to process information." *Id.* at 666. More specifically, Plaintiff's scores on word-reading and color-naming tests indicated deficits in his visual processing speed so severe that the scores placed him in the bottom 0.1% of all individuals. *Id.* In most of the other categories of processing speed, Dr. Wanlass found that Plaintiff had moderate and mild deficits. *Id.*

In the area of mental control, Dr. Wanlass administered three diagnostic instruments (in addition to the portions of the WAIS-IV that gauge auditory attention span and working memory) and concluded that Plaintiff "tested mostly in the impaired range on measures of working memory, attention, and mental flexibility . . . [which] indicates that he will have difficulty screening out distractions, holding information in working memory, and shifting his attention when he has to keep more than one thing in mind at the same time." *Id.* at 666-67. Specifically, Plaintiff's score on the Delis-Kaplan Executive Function ("D-KEFS") Color-Word Inference Test ("CWIT") was indicative of severe deficits in his abilities regarding selective attention such that his performance was ranked in the bottom 0.1% of all individuals; and, regarding at least one category of his

1   working memory, Plaintiff's performance on a portion of the WAIS-IV placed him in the bottom

2   2% of all individuals. *Id*. As it pertains to ADHD – Dr. Wanlass administered two diagnostic

3   instruments, the results of which indicated that Plaintiff struggled with symptoms of ADHD as to

4   inattention, impulsivity, and sluggish cognitive tempo, such that his self-reported ADHD-

5   symptom-count was assessed as spanning between the borderline and somewhat symptomatic

6   range, and his childhood ADHD-symptom-count was measured as falling in the marginally-

7   symptomatic range. *Id*. at 667-68.

8       In assessing Plaintiff's abilities as to learning and memory, Dr. Wanlass administered four

9   diagnostic instruments (in addition to the portions of the WAIS-IV that gauge remote memory).

10   *Id*. at 668. In this regard, Dr. Wanlass first noted that both Plaintiff and his mother reported that

11   Plaintiff had been experiencing increased difficulties since the accident – "[h]e reported that he

12   occasionally forgets to eat and his mother reported that he requires reminders to take his

13   medication, brush his teeth, and shower . . . [and] that he has forgotten things on the stove in the

14   past." *Id*. As to visual learning and memory, Plaintiff's performance on the various components of

15   the Rey Complex Figure Test (measuring design recall and design recognition) resulted in scores

16   that all placed him below the bottom 1% of all individuals. *Id*. Plaintiff's performance on the

17   logical memory portions of the Wechsler Memory Scale - Fourth Edition ("WMS-IV"), and the

18   Rey Auditory Verbal Learning Test ("RAVLT") were mostly indicative of severe deficits in the

19   areas of word list learning, post-distraction recall, and immediate story recall – placing him in the

20   bottom 0.1% of all individuals. *Id*.  Thus, Dr. Wanlass concluded that Plaintiff's "ability to learn,

21   retain, recall, and recognize new verbal and nonverbal (visual) information tested in the impaired

22   range, with all scores falling at or below the 2nd percentile . . . [meaning that] those who

23   communicate with Mr. Richardson should not assume that he is retaining what they tell him." *Id*.

24       Regarding Plaintiff's abilities in the realm of communication, Dr. Wanlass administered

25   five diagnostic instruments (in addition to the portions of the WAIS-IV that assess a person's

26   vocabulary). *Id*. at 668-69. As to listening comprehension and vocabulary, Plaintiff scored in the

27   bottom 1st and 2nd percentiles respectively; as a result of which, Dr. Wanlass concluded that

28   Plaintiff's "ability to read and spell tested in the mild-deficit range . . . [and] [w]hile able to follow

United States District Court
Northern District of California

6

United States District Court
Northern District of California

three-step commands and repeat phrases immediately after hearing them, he tested in the moderate-deficit range on a listening comprehension task that required him to remember short stories and draw inferences from what he heard." *Id.* at 669.

In assessing motor functions, Dr. Wanlass administered two tests that measured manual dexterity and hand strength – the results of which established that Plaintiff occupies the impaired range in both categories as to both hands. *Id.* To gauge Plaintiff's visual-spatial abilities, Dr. Wanlass administered a vision screen (which determined Plaintiff's vision was 20/20), and the Rey Complex Figure Test (in addition to the two components of the WAIS-IV that gauge abilities in the areas of spatial relations and block construction). *Id.* at 669-70. Regarding the ability to copy complex figures, Plaintiff scored in the bottom 1st percentile, while also manifesting mild deficits in his abilities regarding spatial relations and block construction – consequently, Dr. Wanlass found that Plaintiff's scores in this area "reflect[] impaired planning and insufficient attention to detail." *Id.* at 670.

In gauging mental status and his psychological adjustment, Dr. Wanlass conducted a clinical interview geared towards evaluating Plaintiff's life stressors; his behavioral control; his thought process, judgment, and insight; as well as searching for any evidence of suicidal or homicidal ideations; additionally, he administered a pair of diagnostic instruments geared towards determining evidence of depression and anxiety. *Id.* at 670-71. In these areas, Dr. Wanlass found that Plaintiff exhibited evidence of depressed mood "in the clinically elevated range," as a result of feeling frustrated about his cognitive challenges due to difficulty expressing his thoughts and desires, difficulty with listening comprehension and slower thinking speed, as well as frustration with the inability of other people to understand what he tries to explain. *Id.* at 670. Consequently, Plaintiff has been emotionally flat since the accident, his appetite has decreased, he has experienced difficulty with sleep maintenance, and has sometimes become so overwhelmed with these frustrations and difficulties that "he thinks he would be better off dead." *Id.* As to anxiety, Dr. Wanlass found evidence to indicate that Plaintiff experiences a moderate anxiety range because of persistent worries about his future in light of his awareness of his cognitive challenges – in essence, Plaintiff's thought process is often dominated with worries related to being able to

1    one day attend college and become independent. *Id*. at 671. Further, Plaintiff's anxiety is also

2    fueled by the fact that "since the accident[,] he has had a fear of death . . . [and] that sometimes he

3    wakes up in the middle of the night and [is] unable to fall back asleep due to his worries about the

4    future." *Id*. In the domain of behavioral control, Dr. Wanlass noted that Plaintiff's above-described

5    difficulties and frustrations have resulted in his becoming more easily irritable since the accident.

6    *Id*. Importantly, regarding judgment and insight, Dr. Wanlass noted that Plaintiff "needs some

7    supervision and assistance [in] making safe and appropriate decisions in real life situations,

8    according to his mother, and this makes sense given his memory, attention, and problem-solving

9    difficulty." *Id*.

10          In the end, as a result of this exhaustive battery of testing and evaluation, consisting of no

11   less than twenty-nine separate diagnostic tests, Dr. Wanlass rendered four diagnostic impressions:

12   (1) major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance

13   ("he still requires some supervision and assistance with making safe and appropriate decisions in

14   regards to health and safety, self-care, and self-direction"); (2) ADHD with a predominantly

15   inattentive presentation (due to his demonstrated difficulty with shifting focus, sustaining attention

16   over time, and screening out distractions); (3) specific learning disorder, with impairment in

17   mathematics (given that his mathematical and arithmetic reasoning tested at the bottom 1st

18   percentile); and, (4) adjustment disorder, with mixed anxiety and depressed mood (because of

19   continued frustration associated with decreased cognitive functioning and diminished levels of

20   independence after his severe brain injury). *Id*. at 671-72. As to limitations with respect to specific

21   domains of functioning due to these diagnoses, Dr. Wanlass found that Plaintiff's abilities in the

22   following areas were in the mild to moderate deficit range: his nonverbal (visual-spatial) reasoning

23   ability; his ability to read and spell; his vocabulary knowledge; his immediate ability to follow

24   three-step commands; and his abilities regarding block construction and rotating objects in his

25   mind. *Id*. at 672-73. However, with regard to the following domains of functioning, Dr. Wanlass

26   found that Plaintiff's abilities were fully impaired: his processing speed (meaning that Plaintiff

27   will generally require additional time to process information); his working memory, attention, and

28   mental flexibility (meaning that he will have difficulty screening out distractions or holding

United States District Court
Northern District of California

8

information in his working memory or shifting attention); his ability to learn, retain, and recall new verbal and nonverbal information (test results indicated he operates at or below the bottom 2nd percentile); and, his manual dexterity and grip strength in both hands. *Id.*

Lastly, Dr. Wanlass rendered a series of recommendations. *Id.* at 673-74. Specifically, as to Plaintiff's desire to continue his education, Dr. Wanlass noted that "test results raise serious questions about his ability" to do so. *Id.* at 673. As to Plaintiff's ability to seek and maintain employment, Dr. Wanlass opined that, "[i]n our judgment, his significant cognitive limitations will preclude him from competitive employment at this time, and we encourage him to pursue disability." *Id.* at 674. As to activities of daily life, Dr. Wanlass noted that Plaintiff "will continue to require family supervision and assistance with health care, including medication management and doctor appointments, meal preparation, transportation, and finances . . . [and] [p]recautions should be taken so that inattention does not pose [a] danger (e.g., leaving the stove on)." *Id.* Lastly, in addition to "discouraging him from attempting to drive at this time due to the difficulties noted above (e.g., processing speed, attention)," Dr. Wanlass also noted that Plaintiff would benefit from a continued psychotherapeutic regime "that takes into account the presence of attention and problem-solving limitations . . . focus[ed] on improving [his] management of depressed mood, stress, anxiety, irritability and sleep-problems." *Id.*

### *Medical Evidence from Non-Treating Consultants*

Shortly before Plaintiff's evaluation by Dr. Wanlass, he was referred for a one-time consultative examination by the state disability evaluation agency to Paul Martin, Ph.D., who performed a mental status examination and a clinical interview of Plaintiff, reviewed some records, and administered an IQ test and a memory test. *Id.* at 524-530. Dr. Martin measured Plaintiff's full-scale IQ score at 77, and evaluated his memory to operate in "the borderline to low average range, indicating mile (sic) difficulties with new learning and memory, although memory skills appear to be grossly intact." *Id.* at 528-29. Dr. Martin's diagnostic impressions were limited to cognitive disorder, not otherwise specified ("NOS"); depressive disorder NOS; and cannabis abuse. *Id.* at 529. Additionally, he completed a functional assessment and opined that Plaintiff was only "mildly limited" in each of the 8 categories of work-related abilities, and that he has the

United States District Court
Northern District of California

9

1    ability to manage funds independently. *Id.* at 529-30.

2         At the October 11, 2017, hearing before the ALJ, testimony was taken from a medical

3    expert, Carlos, Kronberger, Ph.D., a Louisiana-licensed clinical psychologist and disability

4    consultant for the Social Security Administration. *Id.* at 50-73, 897-99. Under examination by the

5    ALJ, Dr. Kronberger noted the source of his disagreement with Dr. Wanlass's assessments by

6    opining that Dr. Wanless may have placed too much emphasis on reports from Plaintiff's mother

7    regarding Plaintiff's functional abilities. *Id.* at 52. Additionally, Dr. Kronberger opined that many

8    of Plaintiff's memory and learning problems could be due to his cannabis use, rather than the brain

9    injuries he suffered in his accident or his preexisting learning disability. *Id.* at 52-54. Thus, basing

10   his analysis only on Dr. Martin's report, Dr. Kronberger opined that Plaintiff's conditions do not

11   meet or equal any listings because Dr. Martin's report gave "a lot of weight to the use of

12   marijuana, as contributing to the memory impairment." *Id.* at 54. As to interpreting Dr. Wanlass's

13   report, Dr. Kronberger maintained that "I can't make an inference . . . if the Claimant were limited

14   to simple, repetitive tasks, and simple jobs, whether he would have significant limitations . . .

15   [because Dr. Wanlass was only] considering what he would need if he were to go to college." *Id.*

16   at 55. Musing further about Dr. Wanlass's report, Dr. Kronberger then added that "it's a very

17   comprehensive assessment, but there are a few little areas that I'm not, you know, totally

18   completely comfortable. For example, he gives us tests I'm not even familiar with . . . [t]here's a, I

19   think, a discrepancy in having such a low score on the arithmetic substance of the wide range

20   achievement test, in the first percentile, which is very, very low. I don't know how anybody who

21   graduated high school, even if they [later] had an injury, would have such a huge deficit." *Id.* at

22   56.

23        When asked if he gave greater weight to the assessment performed by Dr. Martin than to

24   the one performed by Dr. Wanlass, Dr. Kronberger stated, "I think I am. I'm giving a little bit

25   more weight to that. I mean, he did a lot fewer tests, Dr. Martin, but this - - the profile that

26   emerges from Dr. Martin suggests that if there has been some sort of pattern of deficit, it's

27   relatively minor." *Id.* at 57. Dr. Kronberger then suggested bridging the gap between the

28   limitations opined by Drs. Martin an Wanlass, by simply "say[ing] that the Claimant would have

1    moderate difficulties from (sic) understanding, remembering, or applying information," as well as

2    in the domains of concentration, persistence, and pace, and with regard to adapting and managing

3    himself. *Id*. at 58-59, 60, 65. As to limitations related to interacting with others, Dr. Kronberger

4    suggested that Plaintiff "kind of appears to have a fair amount of social activities going on in his

5    life, as described by all the doctors, not in these two reports." *Id*. at 59.

6    ***Lay Witness Testimony***

7            In addition to submitting third party function reports on his behalf, Plaintiff's mother, Ms.

8    Angela Jackson, also testified at the hearing before the ALJ. *Id*. at 42-45, 79-84. When asked to

9    explain why her son would be unable to function in the workplace, Ms. Jackson testified that her

10   son's difficulties with comprehension, information processing, and memory require her to

11   "constantly [need to] remind him about his daily hygiene, as far as like taking his medication that

12   he's supposed to take daily, dressing the appropriate way, [and] like eating [] he'll go all day

13   without eating. I have to constantly - - like are you hungry? I have to ask him like if I'm talking to

14   my eight or twelve-year-old at home." *Id*. at 43. Ms. Jackson then offered an example of how

15   Plaintiff had recently been hired at Goodwill through a program where "you know, they hire

16   people with disability problems," but that he was nevertheless terminated due to the fact that "he

17   kept forgetting . . . the manager [would] get irritated with him because, you know, the things he

18   forgot. So they end[ed] up letting him go." *Id*. at 43. As to Plaintiff's inability to manage the

19   activities of daily living, his mother testified that she has to give him constant reminders to do

20   everything from showering to brushing his teeth, and that Plaintiff's memory function is so

21   impaired that due to the associated fire hazards, Plaintiff is not allowed to use the stove or the

22   oven. *Id*. at 80-81. When Ms. Jackson had tried to rely on Plaintiff to walk to her younger child's

23   school in order to escort his little brother home, the experiment failed when she received calls

24   from the school informing her that her child had not been picked up. *Id*. at 81. As to the need for

25   reminders to take his HIV medication, Ms. Jackson testified that "[a] few months ago he ended up

26   in the hospital, because he [hadn't] taken his medicine. So, I constantly have to remind him of that

27   daily." *Id*. When asked to what extent Plaintiff has improved since the accident, Ms. Jackson

28   quantified it at fifty percent, noting that "[h]e was like a two-year-old when he [first] came home

United States District Court
Northern District of California

1   [a]nd I had to teach him everything all over again." *Id*. Lastly, Ms. Jackson related that even

2   before the accident, when Plaintiff was still in high school, that due to his learning disability, he

3   was part of a special education program where he would attend regular classes but such that "they

4   gave him more time to do his work . . . [because of] his attention span, it was hard for him to

5   focus." *Id*. at 82.

6          Through the third-party function report that Ms. Jackson submitted on her son's behalf, she

7   reiterated that due to his condition, Plaintiff requires assistance in nearly all of the activities of

8   daily living. *Id*. at 308-14. She noted that he generally does not go out alone because he "will

9   easily get lost." *Id*. at 311. She added that Plaintiff is unable to pay bills, correctly count change,

10  handle money, or to manage a bank account. *Id*. at 311-12. She also noted that Plaintiff's social

11  activities are limited to playing video games with his younger siblings, and talking to his older

12  brother on the telephone. *Id*. at 312. Ms. Jackson added that, since the accident, Plaintiff's speech

13  is "off," and that as a result of his "memory issues" he is unable to follow either written or spoken

14  instructions without significant assistance. *Id*. at 313. She also noted that since the accident,

15  Plaintiff experiences heightened paranoia in that "[h]e thinks we're being followed by others if

16  they're driving behind us too long," as well as thinking that people are staring at him which makes

17  him upset. *Id*. at 314.

18          **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

19          A person filing a claim for social security disability benefits ("the claimant") must show

20  that he has the "inability to do any substantial gainful activity by reason of any medically

21  determinable physical or mental impairment" which has lasted or is expected to last for twelve or

22  more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in

23  the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

24  step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

25  416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

26  the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

27          Here, the ALJ set forth the applicable law under the required five-step sequential

28  evaluation process. *AR* at 18-19. At Step One, the claimant bears the burden of showing he has not

United States District Court
Northern District of California

been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 19. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: status post traumatic brain injury (TBI), with residual neurocognitive disorder; a depressive disorder vs. an adjustment disorder; and ongoing cannabis abuse. *AR* at 19. Additionally, the ALJ found that Plaintiff's HIV is non-severe because "thus far he has no related physical effects," and that his ADHD is not "not a medically determinable impairment," because Dr. Wanlass's "diagnosis is unsupported by any other evidence." *Id*.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 20-21. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of work at all exertional levels but with the following non-exertional limitations: that Plaintiff can understand and follow only simple one and two-step instructions and complete related tasks, with no required public interaction. *Id*. at 21-26.

At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work because he has no past relevant work. *Id*. at 26. Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff's age, education, work experience, and after consulting a vocational expert

United States District Court
Northern District of California

1   ("VE"), that there are jobs that exist in significant numbers in which Plaintiff can still perform –

2   namely, the ALJ found that Plaintiff could perform the functions of a laborer, a transportation

3   cleaner, and a housekeeping cleaner. *Id.* at 26-27. Accordingly, the ALJ concluded that Plaintiff

4   had not been under a disability, as defined in the Social Security Act, from January 20, 2015,

5   through the date of the issuance of the ALJ's decision, February 14, 2018. *Id.* at 27.

6                                    **DISCUSSION**

7           Plaintiff raises four issues and maintains that the ALJ erred: (1) by improperly weighing

8   the medical opinion evidence; (2) by improperly rejecting Plaintiff's testimony; (3) by improperly

9   rejecting lay witness testimony; and (4) by rendering a Step Five determination that was not

10  supported by substantial evidence. *See* Pl.'s Mot. (dkt. 18) at 6, 11-22. Defendant submits that the

11  ALJ "reasonably resolved the conflict" between the opinions of Drs. Wanlass and Martin by

12  relying on the opinion of Dr. Kronberger. *See* Def.'s Mot. (dkt. 24) at 3-5. As for the rejecting of

13  Ms. Jackson's testimony, Defendant concedes that "[e]ven though the ALJ did not reject Ms.

14  Jackson's testimony separately, it is clearly (sic) that he considered her statement[s] and rejected

15  [them] because of the same inconsistencies with the record evidence." *Id.* at 8-9. Further,

16  Defendant contends that substantial evidence supports the ALJ's decision, that any errors that may

17  have been committed were harmless, and, that if the court were to identify an error, the proper

18  remedy would be a remand for further proceedings. *Id.* at 9-11. For the reasons stated below, the

19  court disagrees with each of Defendant's contentions.

20          The court will begin by noting that medical opinions are "distinguished by three types of

21  physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do

22  not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

23  claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The

24  medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is

25  well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

26  inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §

27  404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a

28  treating doctor's opinion is not controlling, the opinion is weighted according to factors such as

the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (9th Cir. 1995); *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). It should also be noted that greater weight is due to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5); *Revels*, 874 F.3d at 654. In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

In this case, the ALJ wholly rejected the opinions of Plaintiff's treating psychologist, Dr. Wanlass, in favor of the opinion of a one-time examining consultant (Dr. Martin) as modified by a non-examining medical adviser (Dr. Kronberger). *AR* at 20. In essence, the ALJ gave controlling weight to a non-examining medical adviser; and, in doing so, the ALJ erred at Step Three by erroneously determining that Plaintiff's condition does not meet or equal the severity of the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    criteria described in Listing 12.02 (Neurocognitive Disorders) or Listing 12.04 (Depressive and

2    Bipolar Disorders), and then the ALJ erred again in formulating a RFC that was not based on

3    substantial evidence. *See AR* at 20-26. Initially, the court will note that the ALJ concluded –

4    correctly – that Plaintiff's "marijuana use is not material to a finding of disability." *Id*. at 25.

5    However, the ALJ's reasoning for giving controlling weight to Dr. Kronberger's opinion was

6    neither specific nor legitimate, and the court finds that the ALJ erred by not giving Dr. Wanlass's

7    opinion controlling weight because it was "well-supported by medically acceptable clinical and

8    laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in

9    [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels*, 874 F.3d at 654. For

10   starters, the ALJ misapprehended the record when he based his decision on the notion that "Dr.

11   Kronberger observed that Dr. Wanlass did not address the issue of whether the claimant would be

12   able to sustain simple work with simple instructions . . . [and that] Dr. Wanlass focused on the

13   claimant's ability to handle college level courses." *Id*. at 25. It appears that neither the ALJ, nor

14   Dr. Kronberger, read Dr. Wanlass's report carefully because it was clearly "not focused [only] on

15   the claimant's ability to handle college level courses," given that it plainly and unequivocally

16   noted that "[i]n our judgment, his significant cognitive limitations will preclude him from

17   competitive employment at this time and we encourage him to pursue disability." *See AR* at 674.

18         As to the ALJ's reasoning that Dr. Kronberger believed that Dr. Martin's conclusions were

19   deserving of more weight than those of Dr. Wanlass because Dr. Wanlass measured Plaintiff's full

20   scale IQ at 74, where Dr. Martin had measured it at 77 – the court finds this to be a non-legitimate

21   basis for either Dr. Kronberger or the ALJ to credit Dr. Martin's opinions over those of Dr.

22   Wanlass. The court will note that neither Dr. Kronberger nor the ALJ rendered any explanation as

23   to why a small measure of variation in the measurement of Plaintiff's IQ score over the

24   administering of the WAIS-IV on two separate occasions would necessitate the rejection of Dr.

25   Wanlass's opinions. A second indication that neither the ALJ, nor Dr. Kronberger, exercised due

26   care when reading Dr. Wanlass's report is manifest in the ALJ's incorrect assertion that Dr.

27   Wanlass failed to consider Plaintiff's cannabis use. *See id*. at 25. In the section of Dr. Wanlass's

28   report entitled, "Current Substance Use," Dr. Wanlass clearly related that while Plaintiff "denied

current use of alcohol or tobacco. He reported that he uses marijuana daily." *See AR* at 663. Furthermore, even if this were not the case, it is difficult to conceive how the ALJ can, on one hand, determine that cannabis use is not material to the disability determination, while at the same time (incorrectly, as it were) using that as a basis to reject Dr. Wanlass's opinions. *See id*. at 25. Thus, the ALJ erred when he concluded – for the above stated reasons – that "Dr. Kronberger's evaluation of the record should be accorded the greatest weight because he is the only professional who had the advantage of a review of the entire record . . . [and] was in the unique position of being able to assess the relative value of the reports by Drs. Martin and Wanlass, along with the other medical evidence and the likely effects of the marijuana use." *Id*. On this basis, the ALJ concluded that "[a]ll of the other opinions are assigned less weight, relative to the degree to which they are consistent with Dr. Kronberger's conclusions." *Id*.

As mentioned, Dr. Kronberger had not even carefully read Dr. Wanlass's report because his two principal reasons for finding it disagreeable were either based on factual error (e.g., Dr. Wanlass only opined about Plaitniff's ability to go to college, or Dr. Wanlass was unaware of Plaintiff's cannabis use), or were unexplained and appeared to be nothing more than baseless speculation (e.g., that Plaintiff scored 3 points lower on a later IQ test means that all of Dr. Wanlass's opinions are due to be rejected). Thus, the ALJ's explanations for rejecting Dr. Wanlass's opinions were not even factually accurate, let alone being specific and legitimate reasons based on substantial evidence in the record. Instead, given that Dr. Wanlass's evaluation was undertaken for treatment purposes, rather than forensic or legal purposes (*see id.* at 661), and because his opinions were eminently supported by medically acceptable clinical and laboratory diagnostic techniques, and were otherwise not inconsistent with the other substantial evidence in the case record, Dr. Wanlass's opinions were entitled to controlling weight. *See Revels*, 874 F.3d at 654. Accordingly, because the court has found that the ALJ improperly rejected the above-described opinions from Plaintiff's treating source, those opinions will now be credited as true as a matter of law. *See generally Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *Smolen v. Chater*, 80 F.3d 1273, 1291-92 (9th Cir. 1996); *Lester*, 81 F.3d at 834; *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Hammock v.*

United States District Court
Northern District of California

1  *Bowen*, 879 F.2d 498, 502 (9th Cir. 1989).

2  As to the lay-witness testimony rendered by Ms. Jackson, the court will note that such

3  evidence about a claimant's symptoms is competent evidence that must be considered unless the

4  ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness

5  for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The reasons advanced for

6  rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r, SSA*, 454 F.3d 1050,

7  1054 (9th Cir. 2006). Germane reasons for discrediting such testimony could include

8  inconsistency with the medical evidence, or the fact that the testimony "generally repeat[s]" the

9  properly discredited testimony of a claimant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.

10  2005). Also, it is important to note that the mere lack of support from medical records is not a

11  germane reason to discount lay-witness testimony. *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th

12  Cir. 2017).

13  As Defendant has conceded, not only did the ALJ fail to expressly reject Ms. Jackson's

14  testimony at all, but the ALJ did not even discuss or mention the pertinent portions of that

15  testimony – as recited above. Instead, the ALJ merely engaged in a discussion of certain mundane

16  aspects of her testimony that were of no real import, and then proceeded to only reject Plaintiff's

17  own testimony using the meaningless boilerplate phrase that appears in nearly every ALJ decision

18  to the effect that "the claimant's statements concerning the intensity, persistence and limiting

19  effects of these symptoms is not entirely consistent with the medical evidence and other evidence

20  in the record, for the reasons explained in this decision." *AR* at 22. As mentioned above, Ms.

21  Jackson testified, *inter alia*, that she has to even remind Plaintiff to eat – one would think that

22  testimony from a mother about her 24-year-old son that is so remarkable and so striking would not

23  be so easily overlooked. In any event, the ALJ erred in failing to expressly reject Ms. Jackson's

24  testimony, and so it goes without saying that the ALJ failed to provide "specific" or "germane"

25  reasoning for disregarding the testimony. *See Lewis*, 236 F.3d at 511. Thus, because Ms. Jackson's

26  testimony was improperly rejected, largely by implication and without discussion, that testimony

27  will now be credited as true as a matter of law. *See Schneider v. Commissioner of Social Sec.

28  Admin.*, 223 F.3d 968, 976 (9th Cir. 2000) (crediting lay witness evidence the ALJ rejected and

18

1    remanding case for payment of benefits).

2    **<u>Nature of Remand</u>**

3         The decision whether to remand for further proceedings or for payment of benefits

4    generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

5    1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

6    been fully developed and where further administrative proceedings would serve no useful

7    purpose." *Smolen*, 80 F.3d at 1292.

8         The Court of Appeals for the Ninth Circuit has established a three-part test "for

9    determining when evidence should be credited and an immediate award of benefits directed."

10   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of

11   benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for

12   rejecting such evidence; (2) there are no outstanding issues that must be resolved before a

13   determination of disability can be made; and, (3) it is clear from the record that the ALJ would be

14   required to find the claimant disabled were such evidence credited. *Id*. The second and third

15   prongs of the test often merge into a single question; that is, whether the ALJ would have to award

16   benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v.*

17   *Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule

18   are satisfied, and a careful review of the record discloses no reason to seriously doubt that a

19   claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

20        Here, in light of the above-discussed and improperly discredited medical opinion evidence

21   and lay witness testimony – it is clear that the ALJ would be required to find Plaintiff disabled on

22   remand. First, even putting aside Plaintiff's ADHD, HIV, and Adjustment Disorder (all of which

23   the ALJ erroneously discounted at Step Two), as described by Dr. Wanlass, Plaintiff's

24   neurocognitive disorder due to traumatic brain injury clearly meets the criteria of Listing 12.02.

25   *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 12.02. The court notes that the pertinent definitions

26   section (§ 12.00(B)(1)(b)) includes traumatic brain injury in the list of disorders that can cause

27   what would be considered a "major neurocognitive disorder." To satisfy the criteria of Listing

28   12.02 – it is necessary to satisfy the criteria listed in subparts (A) and (B), or (A) and (C). *See id*.

United States District Court
Northern District of California

Subpart (A) requires: medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas: complex attention; executive function; learning and memory; language; perceptual-motor; or social cognition. § 12.02(A). Based on Dr. Wanlass's report, Plaintiff clearly meets *all* of these criteria – let alone "one or more." Subpart (B) requires: extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; adapting or managing oneself. § 12.02(B). Based on the combination of the above-discussed medical evidence from Dr. Wanlass and the lay testimony of Plaintiff's mother, Plaintiff clearly meets or exceeds the criteria of Subpart (B). The alternate provision from Subpart(C) requires: Plaintiff's mental disorder to be "serious and persistent," such that there is a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of his daily life. § 12.02(C). Although it would not even be necessary, given that Plaintiff's condition matches more than the required components of the criteria in Subparts (A) and (B), the court will note that the combination of the evidence from Dr. Wanlass's evaluation and Mr. Jackson's lay witness testimony clearly establish that Plaintiff's condition also satisfies *all* of the components of Subpart (C) as well.

Furthermore, given that Dr. Martin also diagnosed Plaintiff with a depressive disorder (and Dr. Wanlass diagnosed Plaintiff with a chronic adjustment disorder with mixed anxiety and depressed mood), it is highly likely that on remand, Plaintiff's condition would also meet or equal the criteria of Listing 12.04 (Depressive, Bipolar and related disorders). To satisfy the criteria of Listing 12.04 – it is necessary to satisfy the criteria listed in subparts (A) and (B), or (A) and (C). *See id*. Subpart (A) requires medical documentation of a depressive disorder, characterized by five or more of the following: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or

retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. § 12.04(A). Based on Dr. Wanlass's report, Plaintiff clearly meets seven of these criteria, which is nearly *all* of them with the exception of observable psychomotor agitation or retardation, and possibly weight loss. Subpart (B) has the same requirements as in Listing 12.02(B); and, as was the case above, based on the combination of the above-discussed medical evidence from Dr. Wanlass and the lay testimony of Plaintiff's mother, Plaintiff clearly meets or exceeds the criteria of Subpart (B). *See* § 12.04(B). Likewise, Subpart(C) has the same requirements as in Listing 12.02(C), and, once again, as was the case above, the combination of the evidence from Dr. Wanlass's evaluation and Ms. Jackson's lay witness testimony clearly establish that Plaintiff's condition also satisfies *all* of the components of Subpart (C) as well. *See* § 12.04(C).

Additionally, even if Plaintiff's condition did not clearly meet, or equal the severity of the criteria of one or both of these listings; on the basis of the above-discussed evidence that was improperly rejected, the ALJ would be required to find Plaintiff disabled during the formulation of the RFC, as the combination of Dr. Wanlass's opinions and Ms. Jackson's testimony clearly establish that Plaintiff has no residual functional capacity. Finally, in the course of the hearing before the ALJ, the VE testified that "[i]f the person is unable to complete job tasks 16 to 20% of every day, a person is not competitively employable." *AR* at 88. Therefore, on remand, even if one were to overlook the fact that Plaintiff's condition clearly meets or equals two separate listings, and that the improperly rejected evidence would clearly result in a work-preclusive RFC, it is equally clear that the ALJ would also be required to find Plaintiff disabled at Step Five based on the VE's testimony because the rejected evidence established that Plaintiff is simply unable to function in the workplace at all – let alone during a small fraction of each day.

At this juncture it should be noted that in cases where each of the credit-as-true factors is met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances."

Also, notwithstanding the now-familiar and oft-repeated mention of the Commissioner's

United States District Court
Northern District of California

generalized disagreement with the credit-as-true doctrine (*see* Def.'s Mot. (dkt. 24) at 10) ("As a matter of record, the Commissioner disagrees with the credit-as-true rule."), the court notes that the Commissioner's personal opinion notwithstanding, this doctrine constitutes binding authority in this Circuit – such that it would be an abuse of discretion for this court to remand a case for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that a Plaintiff is not, in fact, disabled. *See Garrison*, 759 F.3d at 1021. Needlessly remanding a disability claim for further proceedings would only delay much needed income for claimants who are unable to work and are entitled to benefits, which would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988).

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 18) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 24) is **DENIED**. The ALJ's finding of non-disability is **REVERSED** and the case **REMANDED** for the immediate calculation and payment of benefits.

**IT IS SO ORDERED.**

Dated: June 16, 2020

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California

22